Betty WILSON, Plaintiff,

v.

Albert Russell "Chip" COMAN, H. Dwight Bostick, II, Loyal American Life Insurance Company, and The Benefit Source, Inc., Defendants.

No. CIV.A. 03–A–21–N.

United States District Court,
M.D. Alabama,
Northern Division.

Aug. 20, 2003.

Vernon L. Wells, II, Barry A. Brock, Walston Wells Anderson & Bains LLP, Birmingham, AL, Randall Stark Haynes, Larry Wade Morris, Nancy L. Eady, Morris, Haynes & Hornsby, Alexander City, AL, for plaintiff.

Robert William Bradford, Jr., Jayne Leslie Harrell, Hill, Hill, Carter, Franco, Cole & Black, Montgomery, AL, William C. Wood, Jr., Matthew W. Robinett, Norman, Wood, Kendrick & Turner, Charles D. Stewart, Taffi S. Stewart, Spain & Gillon, L.L.C., Birmingham, AL, for defendants.

## MEMORANDUM OPINION

ALBRITTON, Chief Judge.

### I. *Introduction*

This cause is before the court on Plaintiff's Motion to Remand (Doc. # 10), filed on February 7, 2003. On February 21, 2003, this court entered an Order setting a briefing schedule for Plaintiff's Motion to Remand that was to commence following the completion of six weeks of discovery on issues involving this court's jurisdiction. The briefing schedule encompassed not only this case, but also eight companion cases involving several of the defendants in this case.[1] At each stage of the briefing schedule, the plaintiffs and the defendants only filed one brief, *i.e.* the briefs for the plaintiffs are identical in each of the nine cases. Each defendant likewise only filed one brief and filed a copy in each case in which the defendant was involved. Briefing is complete, and the cases are under submission.

For the purposes of this opinion, the court will address only the issues raised in the instant case, *Wilson v. Coman.* The applicability, if any, of the court's conclusions in this case will be discussed in subsequent opinions in each of the other eight cases.

The Plaintiff, Betty Wilson ("Wilson"), filed this civil action originally in the Circuit Court for Coosa County, Alabama. In her Complaint, Wilson brings state law claims against the Defendant for negligence and/or wantonness, negligent procurement, fraud, suppression, negligent and/or wanton hiring, training, and/or supervision, and conspiracy to defraud. All of the Defendants received service of process except The Benefit Source, Inc. ("TBS"). Wilson has yet to effect service of process on TBS. Defendant Loyal American Life Insurance Company ("Loyal American") removed the case to this court on the basis of federal question jurisdiction. The remaining Defendants who had received service of process, Albert Russell "Chip" Coman ("Coman") and H. Dwight Bostick, II ("Bostick"), joined Loyal American in its removal of the case to federal court. Wilson then filed the instant Motion to Remand.

Wilson's claims involve a universal life insurance policy that she purchased from Loyal American through her employer, Madix, Inc. The Defendants contend that the federal Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, completely preempts Wilson's state law claims and allows the Defendants to remove this case to federal court on the basis of federal question jurisdiction. Wilson argues that her claims do not provide a basis for federal question jurisdiction and asks this court to remand her case to state court.

After carefully and thoroughly reviewing the parties' submissions, the court con-

---

1. The eight companion cases are: 1) *Robinson v. Jones*, 03–A–22–E; 2) *Benson v. Loyal American Life Insurance Co.*, 03–A–40–E; 3) *Ogelsby v. Jones*, 03–A–41–N; 4) *Hicks v. Whatley*, 03–A–42–E; 5) *Harris v. Porter*, 03–A–43–N; 6) *Leonard v. Porter*, 03–A–44–N; 7) *Griffin v. Whatley*, 03–A–56–N; and 8) *Odum v. Loyal American Life Insurance Co.*, 03–A–

186–N. Of the defendants in the instant case, Loyal American Life Insurance Company and The Benefit Source, Inc., are defendants in every case. Albert Russell "Chip" Coman is a defendant in *Benson*, and H. Dwight Bostick, II, is a defendant in *Robinson, Benson, Ogelsby*, and *Hicks*.

cludes that Wilson's Motion to Remand is due to be DENIED.

## II. *Remand Standard*

Federal courts are courts of limited jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994); *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir.1994); *Wymbs v. Republican State Executive Comm.*, 719 F.2d 1072, 1076 (11th Cir.1983), *cert. denied*, 465 U.S. 1103, 104 S.Ct. 1600, 80 L.Ed.2d 131 (1984). They may only hear cases that they have been authorized to hear by the Constitution or the Congress of the United States. *See Kokkonen*, 511 U.S. at 377, 114 S.Ct. 1673. A federal court has an independent obligation to review its authority to hear a case prior to proceeding to the merits of the case. *Mirage Resorts, Inc. v. Quiet Nacelle Corp.*, 206 F.3d 1398, 1400 (11th Cir.2000). The Eleventh Circuit favors remand of removed cases where federal jurisdiction is not absolutely clear. *See Burns*, 31 F.3d at 1095.

## III. *Facts*

The submissions of the parties established the following facts:

Wilson is an employee of Madix, Inc. ("Madix"), a company that manufactures store fixtures at a plant in Goodwater, Alabama. Madix employs approximately 544 employees at its facilities in Alabama. As part of its employee benefits programs, Madix offered "voluntary benefits" to its employees.[2] Among the "voluntary benefits" were universal life insurance, cancer insurance, dental insurance, and disability insurance. Once an employee has been employed by Madix for ninety days, the employee becomes eligible to participate in the "voluntary benefits" program.

Madix's employee benefits programs are administered by the Madix Benefits Committee ("the Committee"). Members of the Committee are: Lenora Hannum ("Hannum"), Division Controller;[3] Joe Chastain ("Chastain"), Human Resources Manager; Nancy Higgins ("Higgins"), Benefits Manager; and Justin Saunders, a Madix executive at Madix's Texas facility. Hannum, Chastain, and Higgins are employed at Madix's Alabama manufacturing plants. During the fall of each year, the Committee holds a meeting to review the benefits offered to employees. The purpose of the meeting is two-fold. The Committee wants both to have a benefits program that can be efficiently operated with Madix's payroll procedures and to have the "best overall package" of benefits available to Madix's employees. Hannum Deposition, p. 38, lines 2–7.

In 2000, the Committee began to review Madix's current offering of voluntary benefits. At that time, Madix's voluntary benefits were provided by Southern Insurance through broker Jerry Ray ("Ray"). The Committee was displeased with Southern Insurance's service and believed that Ray was overselling insurance to Madix employees. *Id.* at p. 25, lines 3–7. The Committee decided to find another source for its voluntary employee benefits program for the next year. The Committee turned to Bostick and his company, The Bostick Group, LLC, for help in finding a new benefits provider to replace Ray and Southern Insurance. In 2000, Bostick and Madix already had a working relationship, for Bostick was Madix's broker for stop/loss insurance and dental insurance. *Id.* at p. 21, lines 13–22; p. 83, lines 1–6. In late May or early June of 2000, Bostick

---

**2.** Madix also offered pre-tax or "cafeteria plan" benefits to its employees that included group term life insurance, health insurance, and a 401(k) plan.

**3.** During the period of limited discovery on the issue of ERISA preemption, Hannum testified in a deposition as Madix's corporate representative.

met with the Committee for the purpose of reviewing Madix's current stop/loss insurance plan. Bostick Deposition, p. 25, lines 11–16. During the meeting, the Committee asked Bostick to research alternative providers of voluntary benefits. *Id.* at p. 29, line 8. On June 7, 2000, Madix sent Bostick documents that described the current voluntary benefits that Madix made available to its employees. *See* Madix Letter of June 7, 2000, to Bostick, attached as Exh. 4, to Defendant Bostick's Evidentiary Submission, Doc. # 21 ("Bostick Submission"). Bostick had requested the information so that he could research and compare alternatives to Southern Insurance.

After making some inquiries in the summer of 2000, Bostick met Eugene "Bud" Porter ("Porter") through a business acquaintance. Porter owns TBS. In the employee benefits market, TBS is a communication and enrollment firm. A client hires a communication and enrollment firm such as TBS to design and implement benefits plans, to communicate those plans to the client's employees, to come to the client's location and enroll the client's employees in the benefits program if the employees choose to purchase the voluntary benefits, and to handle the billing for the voluntary benefits. Bostick Deposition, p. 44, lines 2–11. During the meeting, Porter gave a presentation to Bostick detailing TBS's business and the advantages to a company that deals with TBS. *Id.* After the meeting, Bostick called a TBS customer as a reference, and the customer gave a positive report on TBS. *Id.* at p. 45, lines 1–7.

Bostick decided to introduce Porter and TBS to Madix. In mid-July 2000, the Committee met with Bostick, Porter, and Christy Taylor ("Taylor"), also of TBS. Bostick Deposition, p. 47, lines 15–23. Porter and Taylor gave a computer presentation to the Committee that covered TBS's potential role in designing and implementing a new voluntary benefits plan for Madix. Hannum testified in her deposition that the Committee was "impressed with [TBS's] presentation" and "excited that [the Committee would] not … have to visit with each employee" because TBS "would take that responsibility and convey what [the Committee] asked them to." Hannum Deposition, p. 20, line 20 to p. 21, line 2.

During the late summer of 2000, TBS and the Committee met to select the benefits products that would be offered to employees during the annual enrollment period. According to Hannum, the Committee and TBS met at least twice. Hannum Deposition, p. 65, lines 15–21. During the meetings, TBS showed a Benefits Communication Proposal to the Committee which outlined the various voluntary benefits and provided a "brief" on each benefit. *Id.* at p. 55, lines 8–14. In the initial proposal, the individual "briefs" described the aspects of: 1) group short term disability benefit; 2) universal life benefit; 3) term life benefit, (each of the first three were underwritten by American Heritage Life); 4) accident benefit, underwritten by Continental American Insurance; and 5) cancer benefit, underwritten by Loyal American. *See* Benefits Communication Proposal, attached as Exh. 11, to Loyal American Life Insurance Company's Notice of Filing Evidentiary Materials in Support of Opposition to Plaintiffs' Memorandum of Law in Support of Remand, Doc. # 18 ("Loyal American Submission"). The Benefits Communication Proposal also contained details of TBS's enrollment procedures, billing reconciliation, and client service. *Id.*

At some point during the meetings between TBS and the Committee, TBS prepared a document entitled "Coverage Comparisons" and presented the document to the Committee. The "Coverage Comparisons" compared universal life insur-

ance policies from Colonial Life and Accident, American Heritage Life, and Loyal American. *See* Coverage Comparisons, attached as Exh. 10 to Bostick Submission. After receiving and reviewing the documents provided by TBS, Madix decided to make at least one change in the proposed benefits. The Committee chose to replace the universal life benefit offered by American Heritage Life with the policy offered by Loyal American. Hannum Deposition, p. 58, lines 18–23. This is the policy that is at issue in this lawsuit. Madix, through the Committee, determined that the Loyal American universal life insurance policies would be part of the voluntary benefits offered to Madix's employees.

Bostick participated in the meetings between the Committee and TBS. Bostick's role in the meetings was to serve as an advisor to the Committee and assist the Committee in determining which benefits programs would be ideal for Madix and its employees. Bostick Deposition, p. 54, lines 16–21. Madix, through the Committee, made the final decision on which benefits would be offered to the employees as part of Madix's voluntary benefits program. *Id.* at p. 68, lines 20–21; Hannum Deposition, p. 93, line 4. In September of 2000, Madix appointed Bostick as its sole broker for "all matters relating to employee benefit coverages." Madix Letter of Sept. 21, 2000, to Professional Insurance Company, attached as Exh. 2 to the Bostick Submission; Hannum Deposition, p. 83, lines 12–13. Madix communicated the news of Bostick's appointment as its broker to several insurance companies in letters identical to the one sent to Professional Insurance Company. *See* Exh. 2 to the Bostick Submission (collecting letters to American Heritage Life, Citizens Security Life Insurance Company, Great Southern Life Insurance Company, AFLAC, Allianz Life Insurance Company, and Medical Life Insurance Company). On September 20, 2000, Bostick became a general agent with

Loyal American. *See* General Agent's Agreement between Loyal American and Bostick, attached as Exh. 3 to the Bostick Submission.

After holding meetings with TBS, the Committee decided to finalize its decision to allow TBS to replace Southern Insurance and Ray as the provider of Madix's voluntary benefits. On September 5, 2000, Madix sent letters to TBS, Porter, and Taylor and to Bostick confirming the decision to let TBS "supply the supplemental benefits [to] our employees beginning on January 1, 2001." Madix Letter of Sept. 5, 2000, to TBS, attached as Exh. 6 to the Bostick Submission; *see also* Madix Letter of Sept. 5, 2000, to Bostick, attached as Exh. 6 to the Bostick Submission. The Committee's final decision on the voluntary benefits program, as designed by TBS, was as follows:

1. Group short term disability benefits through American Heritage Life;

2. Accident insurance through Continental Life;

3. Cancer insurance through Loyal American;

4. Term life insurance through American Heritage life; and

5. Universal life insurance through Loyal American.

Hannum Deposition, p. 40, lines 14–19. The Committee based its final decision on the "viability and integrity of the [insurance] carriers" and on the benefit "briefs" prepared by TBS. *Id.* at p. 109, line 21 to p. 110, line 23. For the Loyal American universal life insurance policy at issue, the Committee only reviewed the terms of the policy through the "brief" prepared by TBS; the Committee did not read the policy word for word. *Id.* at p. 110, lines 11–16.

The Loyal American universal life insurance policy that the Committee selected was part of Loyal American's Pinnacle Series of universal life products that are

available through payroll deductions. William R. Ealy, senior vice-president of sales at Loyal American, testified in his deposition that the Pinnacle Series was designed primarily for sale to employer groups as part of a voluntary life insurance program. Ealy Deposition, p. 60, line 22 to p. 61, line 14. The Pinnacle Series has three separate plans: 1) the Bronze Plan for groups of 5 to 499 employees; 2) the Silver Plan for groups of 500 to 999 employees; and 3) the Gold Plan for groups of 1,000 or more employees. *See* Pinnacle Series Manual, at p. 3, attached as Exh. 14 to the Loyal American Submission. Ealy stated that at the time Madix chose the Loyal American universal life plan for inclusion in its voluntary benefits program, the Bronze Plan was the only plan offered by Loyal American in the Pinnacle Series. Ealy Deposition, p. 60, lines 19–21.

Under the Pinnacle Series plan, universal life insurance may be offered to an eligible employee group on either a contingent issue or simplified issue basis. *See* Pinnacle Series Manual, at p. 10, attached as Exh. 14 to the Loyal American Submission. Contingent issue is only available to employee groups of 100 or more employees. *Id.* The sole underwriting requirement for contingent issue is "that an employee has been actively at work on a full-time basis at least 20 hours per week and not missed work, or not been unable to work due to illness or injury, for at least 120 days." [4] *Id.* Madix requested contingent issue basis for its universal life insurance benefit. Ealy Deposition, p. 38, lines 2–10. Considering the underwriting guidelines for the contingent issue policies

and the fact that contingent issue was only available to employee groups of 100 or more employees, Hannum indicated in her deposition that Wilson could not have purchased the Loyal American universal life insurance Pinnacle Series Bronze plan outside of her employment with Madix. Hannum Deposition, p. 45, lines 6–8. Furthermore, Madix only allows employees to purchase through a payroll deduction those life insurance policies chosen by Madix for inclusion in its voluntary benefits program. *Id.* at p. 71, line 23 to p. 72, line 2.

After the benefits for the year 2001 had been selected by the Committee, Madix and TBS began to communicate to Madix's employees about the upcoming opportunity to enroll in the various voluntary benefits. Madix announced the upcoming enrollment meetings by placing inserts in the employees's paychecks and by placing the announcement on the monitors in the employee break areas. *Id.* at p. 32, lines 5–7. The insert informed employees that they would have the option of purchasing voluntary benefits, including universal life insurance, through a payroll deduction. *See* Paycheck Insert, attached as Exh. 17 to the Loyal American Submission. Madix selected several dates in December of 2000 for the enrollment meetings, and Wilson attended one of them.

For the enrollment meetings, TBS relied on various agents to serve as the actual enrollers who would meet individually with each Madix employee. In this action, Defendant Coman is the only enroller sued by Wilson.[5] Coman was an

---

**4.** The underwriting requirements for simplified issue policies are more complicated. According to the Pinnacle Series manual, the underwriting guidelines for simplified issue require a comprehensive health question, an AIDS question, and an avocation question which must be answered by the employee. In addition, a blood and urine test is required on

every application for $100,000 or more in insurance, and an attending physician's statement can be requested by the underwriter. Pinnacle Series Manual, at p. 12, attached as Exh. 14 to the Loyal American Submission.

**5.** Two other enrollers, William Whatley and Belton Jones, assisted Coman in enrolling

American Heritage Life agent who entered into a contract to serve as an agent for Loyal American solely for the Madix enrollment project. Coman Deposition, p. 6, lines 5–9. TBS and Porter had contacted Coman and arranged the agency contract between Loyal American and Coman. *Id.* At the enrollment meeting, Coman's job was to explain Madix's benefit program to employees and to assist them in completing any applications for any benefits the employees may choose to purchase.

The enrollment meetings occurred at Madix's Goodwater facility during work hours. Members of Madix's human resources department were involved in keeping the flow of employees to the enrollers moving. Hannum Deposition, p. 62, lines 4–13. To assist the enrollers in advising the employees, Madix provided the enrollers with specific information about each employee, such as name, social security number, date of birth, dependents, current benefits coverage, and salary. *Id.* at p. 64, lines 2–8. Madix also gave the enrollers copies of Madix's Personnel Policy Manual and information about the company's 401(k) plan, dental insurance, and health insurance. The enrollers were to give this information to each employee during the individual enrollment meeting.

During the actual enrollment meeting, each employee received a copy of Madix's Personnel Policy Manual along with information about Madix's 401(k) plan, dental insurance, and health insurance. Each employee signed a form acknowledging receipt of the manual. The enroller would then present a laptop computer presentation to explain the various employee benefits to each employee. The presentation also covered the cost of each benefit. The enrollers also presented each employee

with a "brief" benefit summary on each voluntary benefit. Of specific importance in this case is the universal life benefit "brief" for Loyal American's universal life insurance policy. The "brief" provides a short description of the details of the policy, including the possible benefits for the employee, his or her spouse, and his or her children. *See* Universal Life Benefit "Brief", attached as Exh. 21 to the Loyal American Submission. After the employee made the decision to purchase any benefits, the enroller would assist the employee in completing the application. Each employee also signed a Benefit Confirmation Report during the meeting. The Benefit Confirmation Report listed each benefit that the employee had chosen as well as the cost. By signing the document, the employee authorized Madix to make payroll deductions to pay for the chosen benefits. *See* Benefit Confirmation Reports, attached as Exh. 15 to the Bostick Submission.

During the enrollment meetings, Coman met with Wilson and gave her the standard presentation. Wilson decided to purchase the Loyal American universal life insurance policy. Coman helped her complete the application. Wilson also signed her Benefit Confirmation Report, which authorized Madix to pay for her universal life policy through a payroll deduction.

Bostick did not participate in the enrollment meetings, and he had no contact with Wilson or with any of the other plaintiffs in the related cases. Bostick Deposition, p. 74, lines 11–18. Wilson testified in her deposition that she neither knew nor had heard of Bostick or The Bostick Group LLC. Wilson Deposition, p. 32, line 21 to p. 33, line 8. Bostick also had no dealings or communication with Coman. In his depo-

Madix employees in voluntary benefits programs. Whatley and Jones are defendants in

several of the other related cases.

sition, Coman testified that he neither knew nor had met Bostick. Coman Deposition, p. 7, lines 12–17.

The new benefits chosen by the employees were to begin on January 1, 2001. To pay for the universal life benefit, Madix elected to self-bill. Under self-billing, Loyal American would not send a monthly bill to Madix. Instead, Madix would make payroll deductions each week from each employee's paycheck. These deductions were held in an accrued account until the total bill was paid at the end of each month. Madix would generate its own bill and send that bill along with the list of payroll deductions to TBS. TBS would "reconcile" the two documents and return the corrected information to Madix. At that point, Madix's payroll department would send a check to Loyal American to cover the amounts due for each employee who purchased Loyal American's universal life policy. *See* Hannum Deposition, pp. 22–23 (describing self-billing process).

Despite using the self-billing procedures described above, deductions from individual employee's paychecks were not always sufficient to cover the cost of the employee's voluntary benefits. In three cases in January 2001, Madix paid the premiums for an employee's Loyal American universal life insurance policy because the employee did not receive enough take-home pay to cover the cost of the deductions. Hannum testified in her deposition that an employee may not make enough in salary to cover the cost of the deductions when the employee was either on "short time" or out of work. Hannum Deposition, p. 73, lines 16–23. Additionally, Madix occasionally had problems in its payroll department which resulted in some employees not having the proper deductions withheld from their paychecks. *Id.* In January 2001 alone, Madix paid the universal life insurance premiums for three different employees without being compensated ful-

ly by an accompanying payroll deduction from those employees' paychecks. *Id.* at p. 111, line 13 to p. 112, line 13.

The Loyal American universal life insurance policies took effect on January 1, 2001. Wilson began making premium payments for the policy through a payroll deduction. Wilson did not, however, continue making payments on the policies she owned prior to enrolling in the Loyal American policy. Wilson contends that the Defendants failed to disclose to her any information about what would happen to the insurance policies she had in effect prior to Madix's switch from Southern Insurance to TBS as the provider of its voluntary benefits program, and led her to believe that coverage was simply being switched to another company providing as good or better benefits. Wilson asserts that the Defendants failed to inform her that her existing policies would remain in effect and that she would continue to owe premiums on those policies. She also alleges that the Defendants failed to advise her that the new policies provided lesser benefits, but for a higher premium because of her age. Wilson stopped making premium payments on her existing policies allegedly on the basis of the representations by the Defendants. At the time Wilson stopped making payments on her existing policies, those policies had been replaced in Madix's voluntary benefits program and were no longer part of Madix's ERISA plan. The old company, without her knowledge, continued to charge premiums against the cash value of the policies, thus reducing that value each time a premium payment was charged. As a result, she lost value in her existing policies and suffered an economic loss when she finally terminated the existing policies and received the then net surrender value.

Wilson alleges that the Defendants committed fraud in misrepresenting the length

of time that surrender charges would be applicable to her Loyal American policy. Under the Loyal American policy, surrender charges will be applied if the owner terminates the policy during the first ten years after it is issued. Wilson contends that the Defendants misrepresented the amount of the surrender charges as well. Through all of these allegedly fraudulent actions, Wilson asserts that the Defendants caused her to suffer economic loss, neither in the form of a denial of benefits nor in a denial of her rights under the policy, but in the fact that she was worse off economically after agreeing to the universal life insurance contract based on the Defendants's alleged misrepresentations than she was prior to agreeing to purchase the Loyal American policy. Through this lawsuit, Wilson seeks to recover those damages along with damages for mental anguish. In essence, Wilson seeks damages for an agreement that she entered into based on allegedly false representations, but not for the actual death benefits of her policy.

### IV. *Discussion and Analysis*

Given the length of this section and the complexity of the legal question at issue, the court believes that a concise and, hopefully, clear statement outlining the court's analysis and reasoning will be helpful. The court will break this statement into several parts:

1. The court believes that *Butero v. Royal Maccabees Life Insurance Co.*, 174 F.3d 1207 (11th Cir.1999), provides the proper standard for analyzing the question of complete preemption in the Eleventh Circuit.

2. The *Butero* standard is in direct conflict with the as-applied reasoning of *Franklin v. QHG of Gadsden, Inc.*, 127 F.3d 1024 (11th Cir.1997).

3. If *Butero* governs, the case should be remanded based on distinctions outlined by a district court in anoth-

er circuit in *Towne v. National Life of Vermont, Inc.*, 130 F.Supp.2d 604 (D.Vt.2000).

4. *Franklin* is an earlier panel decision of the Eleventh Circuit, and, under the prior panel rule, the court must follow it. Under *Franklin's* reasoning, Wilson's state law claims are completely preempted because they "relate to" an ERISA plan.

5. Although only dicta in this case because this court's decision does not rest on this finding, the court concludes that the Eleventh Circuit's oft-repeated statement that claims against an insurer for fraud and fraud in the inducement in the purchase of an insurance policy are in essence claims for benefits under an ERISA plan does not apply to the particular and limited set of facts outlined in this case.

6. The court finds that the Loyal American universal life insurance policy is part of an ERISA plan and that the policy does not qualify for the safe harbor provision found in 29 C.F.R. § 2510.3–1(j).

This Memorandum Opinion has three parts. Part I contains the court's analysis of whether Wilson's claims are completely preempted. Part II covers the court's determination that the Loyal American policy is part of an ERISA plan. Part III discusses the safe harbor provision of 29 C.F.R. § 2510.3–1(j).

### *Part I: Complete Preemption*

 The essential issue before the court is one of jurisdiction. Does this court have jurisdiction over Wilson's state law claims, on the basis of federal question jurisdiction, when it is clear from the face of the complaint that no federal claims are raised? The best place to start is with the Eleventh Circuit's opinion in *Butero v. Royal Maccabees Life Insurance Co.*, 174

F.3d 1207 (11th Cir.1999), which is quoted at length.

> Reviewing ... district court orders [involving ERISA preemption] requires juggling two different kinds of ERISA preemption. The first kind is what this circuit has called complete preemption or "superpreemption." Superpreemption arises from Congress's creation of a comprehensive remedial scheme in 29 U.S.C. § 1132 for loss or denial of employee benefits. When Congress comprehensively occupies a field of law, "any civil complaint raising this select group of claims is necessarily federal in character" and thus furnishes subject-matter jurisdiction under 28 U.S.C. § 1331. Therefore, federal courts have subject-matter jurisdiction over state-law claims that have been superpreempted, and defendants may remove to federal court those actions that contain such claims....
>
> The second kind of preemption we will call "defensive." It originates in ERISA's express preemption provision, 29 U.S.C. § 1144(a). Defensive preemption provides only an affirmative defense to certain state-law claims. As an affirmative defense, defensive preemption does not furnish subject-matter jurisdiction under 28 U.S.C. § 1331; "a cause of action arises under federal law only when the plaintiff's well-pleaded complaint raises issues of federal law." On the other hand, defensive preemption does require dismissal of state-law claims.

*Butero*, 174 F.3d at 1211–12 (citations omitted).[6] *Butero* is quoted at length be-

---

**6.** The Supreme Court explained the doctrine of complete preemption in *Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987), in the following manner:

> The question presented by this litigation is whether these state common law claims are not only pre-empted by ERISA, but also displaced by ERISA's civil enforcement provision, § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), to the extent that complaints filed in state courts purporting to plead such state common law causes of action are removable to federal court under 28 U.S.C. § 1441(b).

*Id.* at 60, 107 S.Ct. 1542 (footnotes omitted). As it outlined the question in *Taylor*, the Court made a deliberate effort to separate what the Eleventh Circuit now calls complete preemption and defensive preemption. *Id.* On the same day the Court decided *Taylor*, it also handed down its ruling in *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987).

*Dedeaux* arrived in federal court on the basis of diversity jurisdiction, and, as a result, the only issue facing the court was whether ERISA, through 29 U.S.C. § 1144, preempted (or as the Eleventh Circuit now says, defensively preempted) "state common law tort and contract actions asserting improper processing of a claim for benefits under an insured employee benefit plan." *Id.* at 43, 107 S.Ct. 1549. Dedeaux, the plaintiff in the district court action, contributed to a Pilot Life disability policy through his employer. *Id.* After he was injured in an accident related to his employment, he filed a claim for benefits with Pilot Life. *Id.* Pilot Life paid Dedeaux benefits for a time but then terminated and reinstated his benefits several times. *Id.* Dedeaux brought suit in federal court on state law claims for tortious breach of contract, breach of fiduciary duties, and fraud in the inducement. *Id.* The district court granted Pilot Life's motion for summary judgment on the grounds that Dedeaux's state law claims were, in the current words of the Eleventh Circuit, defensively preempted. *Id.* at 44, 107 S.Ct. 1549. The Fifth Circuit reversed, and the Supreme Court granted certiorari. *Id.*

In deciding the issue, the Court concisely summarized the meaning of 29 U.S.C. § 1144. "If a state law 'relate[s] to ... employee benefit plan[s],' it is pre-empted." *Id.* at 45, 107 S.Ct. 1549. The preemption of which the *Dedeaux* Court spoke is defensive preemption under the *Butero* decision. The *Dedeaux* Court emphasized that Congress's intent, divined from ERISA's legislative history, was to reserve the regulation of employee benefit plans to federal authorities. 481 U.S. at 46, 107 S.Ct. 1549.

The Court then had to determine if Dedeaux's state law claims "related to" an em-

ployee benefit plan. *Id.* at 47, 107 S.Ct. 1549. The court noted that its decision in *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), emphasized the breadth of § 1144's preemptive reach. *Dedeaux,* 481 U.S. at 47, 107 S.Ct. 1549. In *Shaw,* the Court stated that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." 463 U.S. at 96–97, 103 S.Ct. 2890. Applying the broad scope of § 1144's "relates to" standard and finding no applicable exception under § 1144, the Court concluded that Dedeaux's state law claims were, using the Eleventh Circuit's vernacular, defensively preempted. *Dedeaux,* 481 U.S. at 49–57, 107 S.Ct. 1549.

*Dedeaux* paints with a broad brush and seemingly sweeps almost any claim that has even a slight relationship to an ERISA plan under its preemptive scope. The Court, through the *Taylor* opinion, immediately clarified that the broad defensive preemption discussed in *Dedeaux* is applied by federal courts only in those situations when federal jurisdiction is established. In *Dedeaux,* diversity provided the basis for jurisdiction. In *Taylor,* the court confronted the same issue faced by this court in the instant case. Are state law claims that "relate to" an ERISA plan and are brought in state court completely preempted such that federal jurisdiction is established without the presence of diversity? 481 U.S. at 60, 107 S.Ct. 1542.

Taylor, the plaintiff in the state court action, was a General Motors employee. *Id.* General Motors maintained an employee benefits plan that included benefits for employees who became sick or were injured on the job. *Id.* Metropolitan Life Insurance Company ("Metropolitan") provided the insurance for the plan. *Id.* Taylor was injured in a job-related accident, and he filed a workers compensation claim. *Id.* He later took a leave of absence due to severe emotional problems. *Id.* at 60–61, 107 S.Ct. 1542. Metropolitan paid benefits to Taylor but eventually stopped making payments after Metropolitan's psychiatrist determined that he was able to return to work. *Id.* at 61, 107 S.Ct. 1542. General Motors later terminated Taylor when he refused to return to work. *Id.*

Taylor brought a lawsuit in Michigan state court against Metropolitan and General Motors, seeking, among other requested relief, "immediate reimplementation of all benefits and insurance coverages Plaintiff is entitled to." *Id.* General Motors and Metropolitan removed the case to federal court on the basis of ERISA. *Id.* The district court found the case to be properly removable and granted General Motors and Metropolitan summary judgment. *Id.* at 61–62, 107 S.Ct. 1542. The Sixth Circuit reversed on the grounds that a federal defense, *e.g.* defensive preemption, does not establish federal jurisdiction and that Congress has only completely preempted state law claims involving § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. *Id.* at 62, 107 S.Ct. 1542. The Supreme Court granted certiorari. *Id.*

In analyzing the case, the Court quickly noted that "[t]his lawsuit 'relate[s] to [an] employee benefit plan.... Accordingly, the suit is pre-empted by [§ 1144(a)] and is not saved' by any exception." *Id.* at 62, 107 S.Ct. 1542 (citing *Dedeaux,* 481 U.S. at 48–51, 107 S.Ct. 1549). Then, as evidence of the distinct line between the defensive preemption explained in *Dedeaux* and *Shaw* and the doctrine of complete preemption previously only applied to § 301 of the Labor Management Relations Act, the court stated that "as a suit by a beneficiary to recover benefits from a covered plan, it falls directly under [§ 1132(a)(1)(B)] of ERISA, which provides an exclusive federal cause of action for resolution of such disputes." *Taylor,* 481 U.S. at 62–63, 107 S.Ct. 1542.

A corollary to the well-pleaded complaint rule, which normally governs whether a complaint bringing state law claims states claims that arise under federal law, allows Congress to "so completely pre-empt a particular area [of law] that any civil complaint raising this select group of claims is necessarily federal in character." *Id.* at 63–64, 107 S.Ct. 1542. The Court has used this corollary to establish complete preemption of claims under § 301 of the Labor Management Relations Act. *Id.* (citing *Avco Corp. v. Aero Lodge No. 735,* 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968)). Only if Congress provides "explicit direction" can an area of law be completely preempted by federal law. *Id.* at 64, 107 S.Ct. 1542. The Court noted that a federal defense, *e.g.* defensive preemption, cannot convert a claim into one arising under federal law. *Id.* (citing *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 25–27, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)).

The Court found Congress's explicit direction in two places. First, 29 U.S.C. § 1132(f) provides:

The district courts of the United States shall have jurisdiction without respect to the amount in controversy or the citizenship of

cause it is important to understand and clarify the distinctions between the two types of preemption as well as the different sections of ERISA that provide the legislative authority for each type of preemption. Complete preemption, or super-preemption, is derived from 29 U.S.C. § 1132, while defensive preemption is based on 29 U.S.C. § 1144. *Butero,* 174 F.3d at 1211–12.[7] This distinction is important because a court must take pains not to apply the test for defensive preemption in a situation, such as this one, where the key question is whether federal question jurisdiction is present based on super-preemption of state law claims.

■ The *Butero* court explained the test that a court should apply to determine if a plaintiff's claims are superpreempted:

the parties, to grant the relief provided for in subsection (a) of this section in any action.

29 U.S.C. § 1132(f). The Court found that this language closely paralleled the language of § 301, which the *Avco* Court concluded completely preempted any state law claims. *Taylor,* 481 U.S. at 64–65, 107 S.Ct. 1542. Second, the Taylor Court relied on the following statement from the conference report on ERISA describing the provisions of § 1132:

[W]ith respect to suits to enforce benefit rights under the plan or to recover benefits under the plan which do not involve application of the title I provisions, they may be brought not only in U.S. district courts but also in State courts of competent jurisdiction. *All such actions in Federal or State courts are to be regarded as arising under the laws of the United States in similar fashion to those brought under section 301 of the Labor Management Relations Act of 1947.* H.R. Conf. Rep. No. 93–1280, p. 327 (1974), U.S.Code Cong. & Admin.News 1974, pp. 5038, 5107 (emphasis added).

*Taylor,* 481 U.S. at 65–66, 107 S.Ct. 1542.

On the basis of those two provisions, the Court concluded that "this suit, though it purports to raise only state law claims, is necessarily federal in character by virtue of the clearly manifested intent of Congress. It, therefore, 'arise[s] under the ... laws ... of the United States,' 28 U.S.C. § 1331, and is removable to federal court by the defendants." *Id.* at 67, 107 S.Ct. 1542.

*Butero's* distinction between complete preemption and defensive preemption traces its roots to Supreme Court case law. As *Dedeaux* and *Taylor* demonstrate, the analysis for each type of preemption is distinct and compartmentalized. *Dedeaux,* with its analysis of defensive preemption, relies on 29 U.S.C. § 1144. *Taylor,* analyzing complete preemption, relies on § 1132 and on Congress's explicit direction that state law claims that seek relief that is available under § 1132 are federal claims.

7. Title 29, section 1132(a) of the United States Code provides, in pertinent part:

(a) Persons empowered to bring a civil action

A civil action may be brought—

(1) by a participant or beneficiary—

(A) for the relief provided for in subsection (c) of this section, or

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

. . .

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan

29 U.S.C. § 1132(a). Violations of subsection (c) include the failure of a plan administrator to provide statutorily required information to plan participants and beneficiaries. The key subsection of § 1132 for the purposes of this Memorandum Opinion is (a)(1)(B). In this case, the court must review Wilson's Complaint to determine if she seeks relief akin to that provided for in § 1132(a)(1)(B).

29 U.S.C. § 1144 provides:

Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

Here's the rule: ERISA super-preemption exists only when the "plaintiff is seeking relief that is available under 29 U.S.C. § 1132(a)." Regardless of the merits of the plaintiff's actual claims (recast as ERISA claims), relief is available, and there is complete preemption, when four elements are satisfied. First, there must be a relevant ERISA plan. Second, the plaintiff must have standing to sue under that plan. Third, the defendant must be an ERISA entity. Finally, the complaint must seek compensatory relief akin to that available under § 1132(a); often this will be a claim for benefits due under a plan.

*Butero*, 174 F.3d at 1212 (citations omitted). One should immediately note from this four part test that the Eleventh Circuit made no mention of § 1144 or its "relate[s] to an employee benefit plan" standard. From a statutory perspective, federal jurisdiction is premised on § 1132(a), and not § 1144, and a court addressing a remand issue must take care not to contaminate an analysis of § 1132 with court decisions interpreting § 1144. For the remainder of Part I, the court will focus on the fourth element of the *Butero* test for complete preemption: Does the Complaint seek compensatory relief akin to that available under § 1132?

In *Butero*, the employer, Simply Fashion Stores ("Simply Fashion"), switched the group life insurance policy which was part of its employee benefits plan from its previous carrier to Royal Maccabees Life Insurance Company ("Royal Maccabees"). 174 F.3d at 1210. The policy that Simply Fashion purchased was one that Simply Fashion owned, and Simply Fashion's employees had no ownership rights over the policy. *Id.* If any employee wished to make a claim, the employee had to file its claim through Simply Fashion. *Id.* After the policy took effect, Royal Maccabees asked Simply Fashion "to provide a 'statement from the company that there had

been no deaths or disabilities since the effective date.'" *Id.* Simply Fashion responded only by saying that "we have had no death claims," making no mention of any disability claims. *Id.* at 1210–11.

This response was important because a month earlier a Simply Fashion employee, Benedict Butero ("Benedict"), had taken some time away from work due to a severe illness. *Id.* at 1211. After receiving this response, Royal Maccabees declined Simply Fashion's request for coverage, canceled the policy, and refunded to Simply Fashion all of the paid premiums. *Id.* On the day that Royal Maccabees sent the letter to Simply Fashion declining Simply Fashion's application for coverage, Benedict died. *Id.* Benedict's wife, Annette Butero ("Annette"), made a claim for benefits through Simply Fashion. *Id.* Royal Maccabees denied Annette's claim, and a lawsuit followed. *Id.*

Annette brought state law claims for breach of contract, bad faith refusal to pay, and fraud in the inducement. *Id.* In *Butero*, the Eleventh Circuit analyzed whether Annette's state law claims were superpreempted. *Id.* at 1212. The court found that Annette's claims satisfied the test for superpreemption. Of interest to the instant case, the *Butero* court noted that

> [T]he damages apparently sought here are available under § 1132: we have held that claims against an insurer for fraud and fraud in the inducement to purchase a policy are in essence claims "to recover benefits due to [the beneficiary] under the terms of the plan." 29 U.S.C. § 1132(a)(1)(BA); *see Engelhardt [v. Paul Revere Life Ins. Co.*, 139 F.3d 1346, 1353 (11th Cir.1998)] (fraud in the inducement is claim for benefits under § 1132(a)(1)); *Franklin [v. QHG of Gadsden, Inc.*, 127 F.3d 1024, 1029 (11th Cir.1997)] (claim based on alleged misrepresentation that certain coverage

would exist is claim for benefits). All the claims here of bad faith refusal to pay and breach of contract both pursue the same relief as the fraud claims—payment of the life insurance benefit. *Cf. Engelhardt,* 139 F.3d at 1354. We therefore conclude that all of [Annette's] claims are properly recast as claims for benefits due under any plan.

*Butero,* 174 F.3d at 1213.

In analyzing the quoted passage from *Butero,* the language that "claims against an insurer for fraud and fraud in the inducement to purchase a policy are in essence claims 'to recover benefits due to [the beneficiary] under the terms of the plan'" immediately draws this court's attention. *Id.* Specifically, Annette made an actual demand for benefits under the plan. *Id.* at 1212. She only commenced her lawsuit after her request for payment of the life insurance benefit was denied. The purpose of Annette's lawsuit was to recover the benefits that she believed she had been wrongly denied.

Having determined that Annette was seeking to recover benefits under an ERISA plan that she claimed she was owed, the court concluded that her state law claims were superpreempted and that they could be removed from state court to federal court. *Id.* at 1212–13. The court decided that Annette was using her state law fraudulent inducement claim to pursue the actual benefits she was denied by Royal Maccabees. *Id.* at 1213. From the *Butero* opinion, it is apparent that Annette sought to recover insurance benefits that she believed she was entitled to as a result of Benedict's death. In contrast, Wilson, who is very much alive, is not seeking actual death benefits from her Loyal American universal life insurance policy. Noting this distinction, the reasoning contained in the case of *Towne v. National Life of Vermont, Inc.,* 130 F.Supp.2d 604

(D.Vt.2000), comes into the picture as persuasive, albeit not controlling, authority.

In *Towne,* the plaintiffs, two oral surgeons who owned an incorporated medical practice, purchased life insurance through defendant National Life of Vermont, Inc., and National Life's agent, J. Townsend Gilbert ("Gilbert"). *Id.* at 605–06. The plaintiffs wanted to purchase the life insurance through a severance trust executive program as a means of deferring income and saving for retirement. *Id.* at 606. The plaintiffs alleged that Gilbert fraudulently induced them to purchase the life insurance by representing that if one of the doctors retired or voluntarily terminated his medical practice, both doctors would be entitled to withdraw from the insurance the amounts they had deposited plus earnings. *Id.* After making $80,000 in contributions to the plan, the plaintiffs dissolved their medical practice. *Id.* The plaintiffs learned that under the language of the policy neither doctor was eligible for benefits. *Id.* In fact, the only employee of the practice who received benefits under the plan was the practice's only non-physician employee, who received $3,260.31 (less taxes) in benefits. *Id.*

The plaintiffs brought suit in Vermont state court on state law claims for fraud, breach of fiduciary duties, and for violation of the Vermont Securities Act and the Consumer Fraud Act only. *Id.* The plaintiffs did not seek relief under any federal statutes. *Id.* The defendants removed the case to federal court, arguing that the plaintiffs' rights and remedies were completely preempted by ERISA. *Id.* The *Towne* court confronted the identical issue facing this court in the instant case.

The *Towne* court first noted that the plaintiffs "do not seek 'to recover benefits due to them under the terms of [their] plan, to enforce [their] rights under the terms of the plan, or to clarify [their]

rights to future benefits under the terms of the plan.'" *Id.* at 608 (quoting 29 U.S.C. § 1132(a)). Instead, the plaintiffs "claim simply that Defendants fraudulently concealed the terms and conditions of the [severance trust executive program] [p]lan in order to induce them to invest in it, and they seek only to be returned to the status quo prior to the adoption of the [p]lan." *Id.* at 608. The defendants argued that the plaintiffs were merely picking and choosing their state law claims in an effort to avoid preemption. *Id.* at 609. The court responded by acknowledging that plaintiffs have a right to make strategic decisions under the well-pleaded complaint rule to choose which claims for relief they will advance in a particular lawsuit. *Id.* Furthermore, the court noted that complete preemption under 29 U.S.C. § 1132(a) only occurs if the plaintiffs seek to recover benefits, enforce rights under a plan, or clarify future rights under a plan. *Id.* The court concluded that plaintiffs, through their state claims, did not seek any of the remedies listed above. *Id.* The plaintiffs simply wanted to be put back in the same position they were before the alleged fraudulent statements and misrepresentations were made by the defendants. *Id.* at 608. Such claims do not give rise to federal question jurisdiction under ERISA, and the court remanded the case to Vermont state court. *Id.* at 609.

As the *Towne* court noted in footnote five of its opinion, an error by the defendants' counsel contributed to the court's decision. *See id.* at 609 n. 5. The defendants failed "to address the issue of this Court's removal jurisdiction and the distinction between 'complete pre-emption' under ERISA [§ 1132(a)] and 'conflict pre-emption' under [§ 1144(a)]. Rather than examining the language of [§ 1132(a)] and the controlling case law interpreting that language, [d]efendants focus[ed] almost exclusively on case law interpreting the words 'relate to' from ERISA [§ 1144(a)],

which, as the Second Circuit made clear in *Lupo [v. Human Affairs Int'l, Inc.,* 28 F.3d 269, 272 (2d Cir.1994) ], has no relevance to federal removal jurisdiction." *Id.* at n. 5. The Eleventh Circuit has also explained the clear distinction between complete preemption, under 29 U.S.C. § 1132(a), and defensive preemption under 29 U.S.C. § 1144(a). *See Butero,* 174 F.3d at 1212 ("ERISA superpreemption exists only when the 'plaintiff is seeking relief that is available under 29 U.S.C. § 1132(a).'") (quoting *Whitt v. Sherman Int'l Corp.,* 147 F.3d 1325, 1330 (11th Cir. 1998)).

If this court were deciding this case on a blank slate with *Butero* and *Towne* as the only available decisions for consultation, the court would distinguish *Butero,* using *Towne's* explanation that a state law claim for fraudulent inducement is not preempted in a case where the plaintiff is not using the lawsuit to pursue benefits denied by the ERISA plan administrator. The facts of the instant case closely mirror the facts in *Towne.* In her Complaint, Wilson contends that the Defendants made false representations and misrepresented material facts in an effort to induce her to purchase universal life insurance policies from Loyal American. At the time the Defendants allegedly made these false representations, Wilson already had one or more universal life insurance policies through a different insurance carrier. According to the Complaint, the Defendants failed to advise Wilson that her existing policies would not be "switched" to her new Loyal American policies and that she would, in essence, be purchasing additional insurance instead of replacing her existing policies. Instead, Wilson would continue to owe premiums on her existing policies, but, due to the fact that she was not paying the premiums, and to the fact that the Defendants allegedly represented that she no longer needed to make the payments, the existing policies

lost value as the premiums were paid out of the cash value of the policy. Wilson also asserts that the Defendants misrepresented the fact that by purchasing universal life insurance through Loyal American she was actually buying less valuable life insurance with greater restrictions on its cash surrender value.

In essence, Wilson is suing the Defendants for their alleged fraudulent and negligent conduct, which caused her to suffer economic losses. The economic loss that Wilson allegedly suffered includes purchasing insurance that was less valuable than her existing policies in terms of benefits, premium charges, surrender charges, and contestability periods and the lost cash value of her existing policies.[8] What Wilson is not suing the Defendants for is a refusal to pay benefits under the terms of the universal life insurance policies or for a clarification of her rights under the policy.[9] Wilson has not made a request for benefits under her universal life insurance policies. *See* Plaintiff's Memorandum in Support of Remand (Doc. # 16), at 25 ("The plaintiffs have not made any claim under the Loyal American policy, nor any claim for damages based on the terms of that policy. Plaintiff does not seek 'benefits' (i.e., payment of death benefits) under the Loyal American policy."). This fact distinguishes the instant case from *Butero.*

*Butero* is not, however, the only Eleventh Circuit opinion which discusses whether state law claims for fraudulent inducement can be removed to federal court on the basis of complete preemption under ERISA. There are at least three

other Eleventh Circuit opinions which speak to the issue of whether a claim for fraudulent inducement is completely preempted. *See Engelhardt v. Paul Revere Life Ins. Co.,* 139 F.3d 1346, 1353 (11th Cir.1998) ("Even though Engelhardt's original complaint purported to raise only a state law claim for fraud, it falls within the scope [of] § 1132(a)."); *Hall v. Blue Cross/Blue Shield of Ala.,* 134 F.3d 1063, 1065–66 (11th Cir.1998) (holding that plaintiff's claim for fraudulent inducement was preempted by ERISA); *Franklin v. QHG of Gadsden, Inc.,* 127 F.3d 1024, 1029 (11th Cir.1997) (finding complete preemption and federal jurisdiction over plaintiff's claim for fraudulent inducement).

Further complicating the analysis for the instant case, the complete preemption analysis utilized in *Hall* and *Franklin* is different from the analysis the court relied upon in *Butero.* As evidence of the apparent contradictions, consider the analysis applied by the courts in *Hall* and *Franklin.* In *Franklin,* the plaintiff was offered a position at Baptist Memorial Hospital ("the Hospital"). 127 F.3d at 1026. Before accepting the position, the plaintiff sought to ensure that her husband would receive the same 24–hour home nursing care under the Hospital's employee benefits plan as he currently received under the plaintiff's employee benefits plan with Goodyear, her current employer. *Id.* The Hospital informed the plaintiff that her husband would receive "grandfather status" into the Hospital's benefits program.

---

**8.** The cash value of these policies decreased after Wilson stopped making premium payments on the advice of the Defendants. Once she stopped making premium payments, the insurance carrier paid the premiums out of her accumulated cash value, thus reducing the policies' value.

**9.** For example, the actual payment of the surrender charges in the Loyal American policy are not at issue. What is at issue is the allegation that the Defendants misrepresented the amount of the surrender charges in an effort to induce Wilson to purchase the policy. Thus, Wilson neither needs to clarify her rights under the policy nor seeks to do so with this lawsuit.

*Id.* The plaintiff resigned her employment with Goodyear and accepted employment with the Hospital. *Id.*

After the Hospital was purchased by the defendant, the defendant, exercising a right given to it under the employee benefits plan, altered the Hospital's employee benefits plan to exclude 24–hour home nursing care. *Id.* The plaintiff filed suit against the defendant in state court and claimed that she was "fraudulently induced to leave her employment with Goodyear as the result of misrepresentations of material facts, suppression, deceit, and fraudulent deceit regarding the medical coverage." *Id.* at 1027. The defendant removed the case to federal court, and the district court denied the plaintiff's motion to remand. *Id.* Despite the plaintiff's arguments that she was not seeking any relief pursuant to the ERISA plan and that she was not alleging a violation of the employee benefits plan, the district court granted the defendant's motion for summary judgment. *Id.*

On appeal, the plaintiff argued that the district court lacked jurisdiction because the complaint contained nothing that subjected it to ERISA's preemptive provisions. *Id.* The court noted the removal standard under § 1132: "ERISA completely preempts the area of employee benefit plans and thus converts state law claims into federal claims when the state law claim is preempted by ERISA and also falls within the scope of the civil enforcement section of ERISA, ... 29 U.S.C. § 1132(a)." *Id.* at 1028. The *Franklin* court further quoted *Kemp v. International Business Machines Corp.*, 109 F.3d 708, 712 (11th Cir.1997): "To sum up, the jurisdictional issue ... turns on whether the plaintiff[ ] [is] seeking relief that is available under 29 U.S.C. § 1132(a)." *Franklin,* 127 F.3d at 1028.

After annunciating the § 1132(a) standard, the court immediately began to analyze the facts of the case under the § 1144 standard. The court stated:

> The alleged misrepresentation *relates* directly *to* [the Hospital's] medical benefits plan. [The plaintiff] was allegedly told she would receive comparable benefits to those available under Goodyear's ERISA benefits plan. [The plaintiff's husband] was "grandfathered" into [the Hospital's] medical benefits plan. The gravamen of [the plaintiff's] grievance against [the defendant] is that it modified its ERISA medical benefit plan to eliminate 24–hour home nursing care. Thus, a determination of the merits of [the plaintiff's] state law claims will require a court to compare the benefits available under the ERISA plans provided by [the Hospital and the defendant] with those provided to its employees by Goodyear. Accordingly, [the plaintiff's] state law claims have a direct connection to the administration of medical benefits under an ERISA plan. We hold, *therefore,* that they are completely preempted.

127 F.3d at 1029 (emphasis added).

The *Franklin* court found complete preemption neither because the plaintiff was seeking benefits under the plan nor because the plaintiff was pursuing a remedy under § 1132(a), but because the resolution of the state law claims *related to* the various ERISA plans at issue. This court respectfully submits, with reliance on the clear delineation drawn by *Butero* between an analysis under § 1132(a) and an analysis under § 1144, that the "relates to" standard of § 1144 should only be applied when the question is defensive preemption. The *Franklin* court confronted the issue of complete preemption and relied on § 1144 and the "relates to" standard. This court submits that such an analysis would be inconsistent with *Butero* and incorrect under § 1132.

In *Hall*, the Eleventh Circuit appears to be dealing both with defensive preemption and complete preemption. *See* 134 F.3d at 1065–66. In that case, Blue Cross/Blue Shield informed Hall that it would deny any claims arising out of surgery she underwent to have an ovarian mass removed. *Id.* at 1064. Blue Cross/Blue Shield based its denial on the fact that the surgery occurred during the 270–day pre-existing condition waiting period. *Id.* Hall contended that Blue Cross/Blue Shield's agents made representations to her that her surgery would be covered. *Id.* When coverage was denied, Hall brought suit in Alabama state court for fraud and fraudulent inducement. *Id.* Blue Cross/Blue Shield removed the case to federal court and moved to dismiss Hall's state law claims on defensive preemption grounds. *Id.* The district court denied Hall's motion to remand and dismissed her state law claims. *Id.* Hall appealed. *Id.*

In describing the question presented by Hall's appeal, the Eleventh Circuit stated that "[t]he issue in this case is whether the district court erred in holding that ERISA preemption applies to Hall's claims based on fraudulent inducement." *Id.* The *Hall* court draws no distinction between defensive preemption and complete preemption. In all fairness, *Hall* predates *Butero* by over a year, but the *Hall* opinion's lack of a distinction between the two types of preemption makes it unclear as to whether the holding applies to defensive preemption or complete preemption. *See Butero,* 174 F.3d at 1207 (decided May 10, 1999); *Hall,* 134 F.3d at 1063 (decided February 4, 1998). Consider the following paragraph:

> Hall fails to consider the practical consequences of litigating her claims in state court. Ultimately, no court will be able to determine whether Hall has been fraudulently induced without resorting to the written policy and assessing the truth of the agents'[s] representations.

> Because the terms of Blue Cross's ERISA-governed policy are critical to the resolution of Hall's fraudulent inducement claims, her cause of action is sufficiently *related to* an employee benefits plan to fall within ERISA's preemptive scope.

*Hall,* 134 F.3d at 1065 (emphasis added).

It appears that the *Hall* court is analyzing whether federal jurisdiction is present or whether the case should be remanded to state court. The standard the court applies, however, as noted by the italicized portion of the text, is the "related to" standard of § 1144. *See id.* As the Eleventh Circuit in *Butero* duly noted, the analysis of complete preemption focuses on § 1132, not § 1144. *See* 174 F.3d at 1211–12 (discussing the differences between the standards for complete preemption and defensive preemption). The above analysis from *Hall* is not incorrect in its result, however. Assuming federal jurisdiction exists, Hall's claims, as the court clearly found, are "related to" an ERISA plan and thus defensively preempted. The question of whether Hall's claims were completely preempted and thus within the jurisdiction of the district court is not clear from the *Hall* court's reasoning. While the end result of defensive preemption is correct, assuming federal jurisdiction, this court is hesitant to apply the *Hall* court's holding that state law claims for fraudulent inducement are preempted when it is unclear whether that preemption is complete or defensive.

 The preemption analysis in *Butero* is in conflict with *Franklin* and *Hall.* If *Butero* were the only circuit precedent on complete preemption, this court could decide to remand this case on the basis that the facts of the instant case mirror the facts in *Towne* and are distinguishable from the facts of *Butero.* The Eleventh Circuit has, however, a very strong prior

panel rule. Under the prior panel rule, as explained by the court in *United States v. Woodard*, 938 F.2d 1255 (11th Cir.1991), "[t]he law in this circuit is emphatic that 'only a decision by this court sitting *en banc* or the United States Supreme Court can overrule a prior panel decision.'" *Id.* at 1258 (quoting *United States v. Machado*, 804 F.2d 1537, 1543 (11th Cir.1986)). Under the prior panel rule, this court must follow the Eleventh Circuit's earliest panel decision. Of the three cases at issue, the earliest is *Franklin*.

At points in the *Franklin* opinion, it is also difficult to determine whether the court is discussing complete or defensive preemption. The court correctly explains that complete preemption depends on whether the plaintiff is seeking relief that is available under § 1132. *See Franklin*, 127 F.3d at 1027–28. At the same time, the court also discusses the defensive preemption standard and the "relates to" standard of § 1144. *See id.* at 1028. From the facts of *Franklin*, it appears that there is little doubt that the plaintiff's state law claims are defensively preempted. The court explicitly explained that "[t]he alleged misrepresentation relates directly to [the defendant's ERISA] medical benefits plan." *Id.* at 1029. Yet, after carefully and repeatedly reading the opinion's final paragraph, it appears that the court reaches the conclusion that the plaintiff's claims are completely preempted because the state law claims are directly related to an ERISA plan. *See id.* at 1029. Specifically, the court stated that the plaintiff's "state law claims have a direct connection to the administration of medical benefits under an ERISA plan. We hold, therefore, that they are completely preempted." *Id.*

The *Franklin* court's as-applied analysis is in direct conflict with *Butero*. In *Butero*, the court emphasized that the complete preemption analysis does not involve a determination of whether a state law claim is "related to" an ERISA plan. *See* 174 F.3d at 1212–13. *Franklin's* final paragraph indicates that the court found complete preemption based on the "related to" standard. *See* 127 F.3d at 1029. This court cannot follow both decisions. Either *Butero* is correct, and this case may be remanded because the facts are distinguishable from *Butero's* facts, or *Franklin* governs, and the case is due to remain in federal court because the resolution of the instant action "relates to" an ERISA plan. In this situation, the court must conform to the prior panel rule and follow the earliest panel ruling.

There is a further complication. In several cases, the Eleventh Circuit has stated directly that claims against an insurer and its agents for fraudulent inducement in connection with the purchase of a policy are preempted by ERISA. *See Butero*, 174 F.3d at 1213 ("[W]e have held that claims against an insurer for fraud and fraud in the inducement to purchase a policy are in essence claims 'to recover benefits due to [the beneficiary] under the terms of the plan.'") (citing 29 U.S.C. § 1132(a)(1)(B)); *Engelhardt v. Paul Revere Life Ins. Co.*, 139 F.3d 1346, 1353 (11th Cir.1998) ("Even though Engelhardt's original complaint purported to raise only a state law claim for fraud, it falls within the scope [of] § 1132(a)."); *Hall*, 134 F.3d at 1065–66 (holding that plaintiff's claim for fraudulent inducement was preempted by ERISA); *Franklin*, 127 F.3d at 1027 (finding complete preemption and federal jurisdiction over plaintiff's claim for fraudulent inducement). This court has noted, under a completely different set of facts than those currently before the court, that *Engelhardt* and *Hall* "do not stand for the broad proposition that ERISA preempts all fraudulent inducement claims." *Mehaffey v. Boston Mut. Life Ins. Co.*, 31 F.Supp.2d 1329, 1335 (M.D.Ala.1998) (Albritton, C.J.).

Of the four Eleventh Circuit cases mentioned above, the court has discussed each except *Engelhardt*. In *Engelhardt*, the plaintiff, a surgeon, had obtained disability insurance through his employer. 139 F.3d at 1348. The plaintiff's policy contained an amendment which excluded disability claims related to "either or both eyes" because the plaintiff had glaucoma. *Id.* After the plaintiff and the insurer entered into discussions over the breadth of the amendment, the insurer allegedly informed the plaintiff that the amendment would be construed with "common sense and reason" and would be limited to glaucoma-related problems. *Id.* According to a letter from the insurer to the plaintiff, the amendment would not be used to deny the plaintiff benefits for "lacerations, puncture wounds, or burns to the eye." *Id.* The plaintiff's coverage took effect in 1993. *Id.* In 1995, the plaintiff suffered a detached retina that was unrelated to his glaucoma. *Id.*

The plaintiff filed a claim for disability benefits under the ERISA plan. *Id.* The insurer denied the claim based on the amendment to the plaintiff's policy. *Id.* The plaintiff brought suit in state court on a state law claim for fraudulent inducement. *Id.* at 1353. The insurer removed the case to federal court on the basis of complete preemption. In analyzing whether complete preemption was present in the case, the Eleventh Circuit stated that:

> Engelhardt's lawsuit is essentially a challenge to [the insurer's] refusal to pay benefits. The last two paragraphs of Engelhardt's original complaint are instructive on this point:
>
>> As a proximate result of the fraudulent inducement by [the insurer], plaintiff accepted the policy. Plaintiff lost monthly disability insurance benefits and will continue to lose such benefits from January 1996 until he reaches the age of 65.

> Wherefore, plaintiff demands judgment against [the insurer] in such amount of compensatory damages as a jury will award, a separate amount of punitive damages, and his costs.

Engelhardt is thus alleging, in effect, that the measure of his compensatory damages is the amount of benefits wrongfully withheld by [the insurer]. The complaint makes no reference to any benefits that Engelhardt gave up by choosing to participate in [the insurer's] plan. Section 1132(a) provides a cause of action for the recovery of plan benefits and allows for the recovery of costs in bringing such a claim. Engelhardt thus "seeks relief that is available under § 1132(a)."

Engelhardt's original complaint did not seek recission [sic] of his contract, and Engelhardt has never attempted to terminate their ERISA relationship. Rather, Engelhardt has stood on his contract and, despite characterizing his claim as one for fraud, has pursued the contractual benefits [the insurer] promised him. His claim thus lies at the heart of § 1132(a).

139 F.3d at 1354. On that basis, the *Engelhardt* court found that complete preemption was present and that Engelhardt's state law claim for fraudulent inducement was removable to federal court. *Id.*

From *Engelhardt* as well as *Butero, Hall,* and *Franklin,* it appears that the Eleventh Circuit has developed its rationale that "claims against an insurer for fraud and fraud in the inducement to purchase a policy are in essence claims 'to recover benefits due to [the beneficiary] under the terms of the plan'" from cases in which the plaintiffs actually do seek to recover benefits under the relevant ERISA plans. *See Butero,* 174 F.3d at 1213 (quoting 29 U.S.C. § 1132(a)(1)(B)).

For example, in *Butero,* the purpose of Annette's lawsuit was to recover benefits she believed she was owed after Royal Maccabees denied her claim for benefits. *See id.* at 1211–13. In *Engelhardt,* the court noted that the plaintiff, "despite characterizing his claim as one for fraud, has pursued the contractual benefits [the defendant] promised him." 139 F.3d at 1354. Such a claim, the court explained, "lies at the heart of § 1132(a)." *Id.* In both *Hall* and *Franklin,* the plaintiffs filed suit because the administrator of the relevant ERISA plans refused to provide the plaintiffs with benefits they believed they were entitled to under the ERISA plans. *See Hall,* 134 F.3d at 1064; *Franklin,* 127 F.3d at 1026–27.

After comparing the facts of the instant case with *Butero, Engelhardt, Hall,* and *Franklin,* a fair argument can be made that the instant case is distinguishable from each of those cases. Following that logic, one could reach the conclusion that the case should be remanded because the factual predicate behind the Eleventh Circuit's language that "claims against an insurer for fraud and fraud in the inducement to purchase a policy are in essence claims 'to recover benefits due to [the beneficiary] under the terms of the plan' " is absent. *Butero,* 174 F.3d at 1213 (quoting 29 U.S.C. § 1132(a)(1)(B)). Wilson is not seeking to recover benefits that Loyal American allegedly wrongfully refused to pay.

That distinction, however, has little bearing on the outcome of the motion to remand, given the current state of the law in the Eleventh Circuit. Under *Franklin,* which this court must follow under the prior panel rule, the case is not due to be remanded because Wilson's claims "relate to" an ERISA plan. The court respectfully submits that this is the improper standard for analyzing the question of whether complete preemption provides a basis for federal jurisdiction, especially after the court considers *Butero.* Nonetheless, with *Butero* and *Franklin* in conflict, this court is bound to follow *Franklin.* *Franklin's* analysis mandates that the instant action can be removed to federal court on the basis of federal question jurisdiction and complete preemption. If, however, the *Franklin* court's analysis is not the current law of the Eleventh Circuit, and if the statement in *Butero* that fraudulent inducement claims are preempted is derived from cases in which benefits were actually denied, then another result would be in order.

The complete preemption and defensive preemption doctrines are very complicated, and the cases are numerous. The facts of the instant case do not fall neatly into any category of case law that allows for an easy or quick answer to be found from Eleventh Circuit case law. The court is mindful of its own history of cases involving fraudulent inducement claims [10] as well as other cases from the Middle District.[11]

10. The court has denied motions to remand in cases where plaintiffs brought state law claims against an insurer for fraud, fraudulent inducement, and fraudulent suppression in connection with an employee benefit plan. *See Hooper v. Albany Int'l Corp.,* 149 F.Supp.2d 1315, 1320–21 (M.D.Ala.2001); *Bridges v. Principal Life Ins. Co.,* 132 F.Supp.2d 1325, 1329–31 (M.D.Ala.2001); *Stoudemire v. Provident Life & Accident Ins. Co.,* 24 F.Supp.2d 1252, 1258–59 (M.D.Ala. 1998); *Culpepper v. Protective Life Ins. Co.,*

938 F.Supp. 794, 800–01 (M.D.Ala.1996); *see also Kirkland v. SSL Ams., Inc.,* 263 F.Supp.2d 1326, 1344–47 (M.D.Ala.2003) (applying complete preemption analysis from *Butero* without reference to § 1144).

11. *See, e.g., Nix v. United Health Care of Ala., Inc.,* 179 F.Supp.2d 1363, 1370 (M.D.Ala. 2001) (DeMent, J.) (denying motion to remand and finding that ERISA completely preempts state law claims for fraud in the denial of medical benefits); *Hardy v. Welch,* 135 F.Supp.2d 1171, 1182–83 (M.D.Ala.2000)

Accordingly, the court will not grant Wilson's Motion to Remand on the basis that the Defendants have failed to prove their complete preemption argument. The task of deciding whether the distinctions between this case and *Butero, Engelhardt, Hall,* and *Franklin,* especially the fact that Wilson is not seeking benefits under the universal life insurance policy, mandate an outcome similar to *Towne* will have to be left to the Eleventh Circuit.

From this court's own review of Eleventh Circuit case law, it appears that *Butero* represents a clarification of the complete preemption and defensive preemption jurisprudence that began with *Taylor* and *Dedeaux.* Perhaps the best answer to the quandary presented by the facts of this case is to request the Eleventh Circuit Court of Appeals to clarify further this area of ERISA law.

▪ The challenge facing this court is that the facts of Wilson's case may, like *Hall,* present a clear opportunity for the Defendants to assert defensive preemption under § 1144. Many of the ERISA preemption cases that have reached the Eleventh Circuit involve questions of both removal jurisdiction (complete preemption) and defensive preemption. *See Butero,* 174 F.3d at 1212–15 (affirming district court's dismissal of Annette's state law claims after finding them superpreempted and then defensively preempted); *Hall,* 134 F.3d at 1065–66 (affirming district court's dismissal of plaintiff's claims on defensive preemption grounds where plaintiff made a demand for benefits under the ERISA plan and plaintiff's state law claims "related to" the ERISA plan). The only issue before this court at this time is one

(Thompson, J.) (denying plaintiffs's motion to remand after finding that claims for fraud and fraudulent inducement are completely preempted by ERISA).

**12.** 29 U.S.C. § 1002(1) provides:

of jurisdiction, which depends solely on whether there is complete preemption, and the court must ensure that the different analyses under § 1132(a) and § 1144 are kept separate. Without jurisdiction on the basis of complete preemption, this court may not reach the issue of defensive preemption. Whether Wilson's claims "relate to" an ERISA plan should be of no concern to this court at the present time. *See Kemp,* 109 F.3d at 712 ("[A] case may not be removed to federal court on the ground of a federal question defense alone, even if that defense is valid.").

### *Part II: ERISA Plan*

Having concluded its analysis of the § 1132(a) issue, the court must next determine if Wilson's claims satisfy the remaining three elements of the test for complete preemption listed by the Eleventh Circuit in *Butero.* Only if these three elements are satisfied will federal question jurisdiction be present. Those three elements are:

1. There must be a relevant ERISA plan;
2. The plaintiff must have standing to sue; and
3. The defendant must be an ERISA entity.

*Butero,* 174 F.3d at 1212. The court will address each of these elements in order.

#### 1. ERISA Plan

▪ In *Donovan v. Dillingham,* 688 F.2d 1367, 1370–71 (11th Cir.1982) (en banc), the Eleventh Circuit outlined the test for determining whether an employee benefit plan or program is an "employee welfare benefit plan" within the meaning of ERISA, specifically 29 U.S.C. § 1002(1).[12] *See Butero,* 174 F.3d at 1214

The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or

(applying the *Donovan* test for an "employee welfare benefit plan"). Under *Donovan*, an "employee welfare benefit plan" requires "(1) a 'plan, fund, or program' (2) established or maintained (3) by an employer or by an employee organization, or both, (4) for the purpose of providing ... death ... benefits ... (5) to participants or their beneficiaries." 688 F.2d at 1371. Using these five elements, the court will evaluate the Loyal American insurance program to determine if it is an "employee welfare benefit plan." *See Nix v. United Health Care of Ala., Inc.*, 179 F.Supp.2d 1363, 1366–67 (M.D.Ala.2001) (applying the five elements from *Donovan* to determine if a plan is an "employee welfare benefit plan").

## A. Plan, Fund, or Program

 The first element is whether the Loyal American insurance program constitutes a plan, fund, or program. An ERISA plan, fund, or program is present whenever "from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Donovan*, 688 F.2d at 1373. The court must look to the Loyal American insurance program to determine if a reasonable person could ascertain from the surrounding circumstances the intended benefits, the intended class of beneficiaries, the source of financing, and the procedures for receiving benefits. *See id.* at 1372 (noting that "ERISA does not ... require a formal written plan").

program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemploy-

### i. Intended Benefits

The Loyal American universal life insurance policy lists the intended benefits that are to be paid in the event that the insured dies before the maturity date of the policy. The policy offers two death benefits, a level option and an increasing option. *See* Loyal American Evidentiary Materials, attached to Doc. # 18, Exh. 23, Specimen Policy, at 6. Under the level option, the death benefit equals the greater of the face amount shown in the policy schedule or the accumulation value of the policy on the first day of the policy month of the insured's death before deducting the cost of insurance for the month, multiplied by a percentage established in the policy. *Id.* The applicable percentages run from 250% for an insured age 0 to 40 to 100% for an insured of age 95. *Id.* Under the increasing option, the death benefit is equal to the greater of the face amount shown in the policy schedule plus the accumulation value, or the accumulation value of the policy on the first day of the policy month of the insured's death before deducting the cost of insurance for that month, multiplied by the applicable percentage. *Id.*

The terms of the universal life insurance policy expressly delineate the intended benefits. *See Williams v. Wright*, 927 F.2d 1540, 1543 (11th Cir.1991) (stating that intended benefits are "not ambiguous" when they are listed in a letter describing the benefits). A reasonable person could ascertain the intended benefits from the terms of the insurance policy. "To be an employee welfare benefit plan, the intended benefits must be ... death ... benefits." *Donovan*, 688 F.2d at 1373. The

ment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

court concludes that the first part of the "plan, fund, or program" test is satisfied.

### ii. Class of Beneficiaries

The Loyal American universal life insurance policy was made available to Madix employees for the purpose of providing death benefits for the employees and their designated beneficiaries. The terms of the policy allow Wilson, as owner of the policy, to designate a beneficiary to receive the death benefits in the event Wilson died before the policy expired. From the surrounding circumstances, a reasonable person could ascertain the class of beneficiaries. Both Wilson's application for insurance and her benefit confirmation report from Madix for the year 2000 listed Wilson's son, Jonathan, as the beneficiary for her insurance policy. *See* Wilson's Application for Payroll Deduction Program, attached as Exh. 2 to Defendant Loyal American's Notice of Removal, Doc. #1 ("Application"); Betty J. Wilson Benefit Confirmation Report, Year 2000, attached as Exh. 16 to Defendant Bostick's Evidentiary Submission, Doc. #21 ("Confirmation Report"). The court concludes that the second part of the "plan, fund, or program" test is satisfied. *See Kirkland v. SSL Ams., Inc.*, 263 F.Supp.2d 1326, 1335–36 (M.D.Ala.2003) (concluding that class of beneficiaries prong is satisfied if the terms of the benefit documents list or describe the intended beneficiaries).

### iii. Source of Financing

The source of financing for Wilson's universal life insurance policy was a payroll deduction from Wilson's weekly paycheck. Both her application for payroll deduction and her benefit confirmation report for the year 2001 list a weekly, after-tax deduction of $11.28 that will be used to pay for her Loyal American universal life insurance policy. *See* Application; Confirmation Report. Wilson's monthly insurance premium was $48.88. *Id.* Based on these documents, Wilson had knowledge of the amount of payments she would be making to purchase and maintain her insurance. Under the payroll deduction plan, Madix would not pay any part of Wilson's premium for her universal life insurance policy. From these circumstances, a reasonable person could ascertain the source of financing for the universal life insurance policy. The court concludes that the third prong of the "plan, fund, or program" test is satisfied. *See Kirkland*, 263 F.Supp.2d 1326, 1335–36 (noting that even if the source of financing was not directly explained, a reasonable person could ascertain the source from the circumstances).

### iv. Procedures for Receiving Benefits

Wilson's insurance policy lists the procedures for receiving benefits. *See* Loyal American Evidentiary Materials, attached to Doc. #18, Exh. 23, Specimen Policy, at 6, 10–13. The court concludes that the final prong of the "plan, fund, or program" test is satisfied.

### v. Conclusion

The court concludes that the Loyal American universal life insurance policy satisfies each of the four parts of the "plan, fund, or program" test established by the Eleventh Circuit in *Donovan, see* 688 F.2d at 1373, and is a "plan, fund, or program" within the meaning of 29 U.S.C. § 1002(1). The court will now address the remaining four elements of the *Donovan* test for an "employee welfare benefit plan" under ERISA. *See* 688 F.2d at 1371 ("[A] welfare plan requires (1) a 'plan, fund, or program' (2) established or maintained (3) by an employer ... (4) for the purpose of providing ... death ... benefits ... (5) to participants or their beneficiaries.").

### B. Established or Maintained

 "A plan is 'established' when there has been some degree of implementation by the employer going beyond a mere intent to confer a benefit." *Butero,*

174 F.3d at 1214; *see Donovan*, 688 F.2d at 1373 ("Acts or events that record, exemplify or implement the decision will be direct or circumstantial evidence that the decision [to establish a plan] has become reality."). The question of whether an employer has "established or maintained" an employee welfare benefit plan is "highly fact-specific." *Boone v. Health Strategies, Inc.*, 213 F.Supp.2d 1304, 1308 (M.D.Ala. 2002). *Butero* provides some excellent guidance for the "established or maintained" inquiry.

In *Butero*, the employer "consulted an insurance agent, selected the terms of the group policy it wished to purchase for its employees, completed an application form for the policy, solicited enrollments from its employees, collected money through payroll deductions, and remitted premium checks to [the insurance company.]" 174 F.3d at 1214. The Eleventh Circuit held that such actions on the part of an employer met the requirement for establishing an ERISA plan. *Id.* Madix also consulted with an insurance agent for the purpose of choosing a company to provide universal life insurance coverage to its employees, collected premiums through payroll deductions, and submitted the premium payments to the insurance company. Other steps that Madix took included: 1) placing annual open enrollment announcements in employee paychecks in an effort to inform employees about the upcoming opportunity to enroll in voluntary benefits, including universal life insurance, through a payroll deduction plan, *see* Paycheck Insert, attached as Exh. 18 to Bostick's Submission; Hannum Deposition, p. 61, lines 8–20; 2) placing a similar announcement on monitors in the employee break areas, Hannum Deposition, p. 32, lines 5–7; 3) making employee attendance at enrollment meetings mandatory, *id.* at p. 63, lines 2–7; 4) choosing the Loyal American universal life insurance policy as the universal life insurance policy that would be offered to Madix

employees as part of their voluntary benefits package, *id.* at p. 47, lines 4–6; 5) selecting TBS as the company that would meet with and enroll Madix employees in the voluntary benefits; 6) making the decision to offer universal life insurance coverage through Loyal American's Pinnacle Series bronze plan, which was limited to employee groups of 100 or more employees; and 7) holding meetings of the Committee to review Madix's current employee benefits and to select new employee benefits.

The court concludes that the above-mentioned steps taken by Madix were sufficient to "establish" an employee welfare benefit plan within the meaning of ERISA and 29 U.S.C. § 1002(1). Through the actions of the Committee, Madix went beyond a mere intent to create an employee welfare benefit plan and actually implemented the plan and gave its employees the opportunity to purchase Loyal American's universal life insurance policy. *See Butero*, 174 F.3d at 1214. Wilson used that opportunity to purchase the universal life insurance policy that is the subject of this litigation. Without Madix's involvement in bringing Loyal American's agents to Madix's Goodwater facility, it is doubtful, based on the record before the court, that Wilson would have had the opportunity to purchase similar insurance outside of her employment with Madix. The Defendants have satisfied the second requirement of the *Donovan* test for an employee welfare benefit plan.

### C. By an Employer

The third requirement of the *Donovan* test for an employee welfare benefit plan is that the plan is established or maintained *by an employer. See Butero*, 174 F.3d at 1214; *Donovan*, 688 F.2d at 1371; *see also Kirkland*, 263 F.Supp.2d 1326, 1340–41 (discussing third requirement from *Butero*). This requirement is satis-

fied. Madix is Wilson's employer. All of the actions that the Committee took (as described above) were taken on behalf of Madix and for the benefit of Madix's employees. Bostick, Coman, and TBS all assisted Madix in preparing the voluntary employee benefits package, but it was Madix, through the Committee, that made the ultimate decision to offer the voluntary benefits to the employees.

### D. To Provide Beneficiaries

The fourth *Donovan* requirement is that the employee benefits plan is established "to provide beneficiaries" with the designated benefits.[13] *Butero*, 174 F.3d at 1214; *Donovan*, 688 F.2d at 1371. The language of the universal life insurance application allowed the purchasing employees to designate a beneficiary to receive benefits in the event of the employee's death. *See* Wilson Application, attached as Exh. 2 to the Complaint (naming Jonathan Wilson and Linda Sue, Wilson's son and daughter, as beneficiaries). Under the terms of the policy, if the employee/owner dies before the maturity date of the policy, the death benefits will be paid to the beneficiary designated in the employee's application[14]. *See* Loyal American Universal Life Insurance Policy, at p. 6, attached as Exh. 2 to the Complaint. The combination of the designation of the beneficiary through Wilson's application and the terms of the policy which state that said beneficiary will receive the death benefits is sufficient to satisfy the fourth *Donovan* requirement. *See Kirkland*, 263 F.Supp.2d 1326, 1340–41

(explaining that fourth *Donovan* requirement is satisfied when documents listing the terms of severance benefits establish which employees are eligible to receive those benefits).

### E. With Death Benefits

The fifth and final *Donovan* requirement is that the employee welfare benefit plan provide beneficiaries with the designated, in this case death, benefits. 174 F.3d at 1214. The terms of the policy explain the amount of benefits to which Wilson's beneficiary may be entitled in the event of her death before the maturity date of the policy. *See* Loyal American Universal Life Insurance Policy, at p. 6, attached as Exh. 2 to the Complaint (explaining amount of death benefit). Under this court's analysis in *Kirkland*, when the documents associated with the benefit plan explain the amount of benefit to which each beneficiary is entitled, the final *Donovan* requirement is satisfied because the document, in this case, the universal life insurance policy, "provides [death] benefits, fulfilling the final [*Donovan*] factor." *Kirkland*, 263 F.Supp.2d 1326, 1340–41.

### F. Conclusion

The court concludes that the Loyal American universal life insurance benefit was part of an employee welfare benefit plan under 29 U.S.C. § 1002(1). This conclusion also fulfills the first of the remaining three prongs of the complete preemption test explained in *Butero*. The court

---

**13.** 29 U.S.C. § 1002(8) provides: "The term 'beneficiary' means a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder."

**14.** Under the language of 29 U.S.C. § 1002(8), there is no requirement that the designated beneficiary be guaranteed to receive any benefits. For example, despite the fact that Wilson designated her son to be a

beneficiary under her universal life insurance policy, her son may not receive any benefits if Wilson surrenders the policy for its net cash value. Wilson's ability to effectively terminate her son's interest in the policy does not, under the plain language of the statute, prevent him from being considered a beneficiary for the purposes of the *Donovan* requirements. Indeed, Wilson herself would also be a beneficiary under § 1002(8), for she could receive benefits under the policy as well.

will now address the remaining two parts of the complete preemption test.

### 2. Standing to Sue

In her Memorandum in Support of Remand, Wilson concedes "that if an ERISA plan were involved in this matter, [she] would have standing to sue under than plan." Memorandum in Support of Remand, Doc. # 16, at 15. Accordingly, the court finds that this requirement is satisfied.

### 3. Defendant Must be An ERISA Entity

Under Eleventh Circuit case law, "ERISA entities are the employer, the plan, the plan fiduciaries, and the beneficiaries under the plan." *Morstein v. Nat'l Ins. Servs., Inc.*, 93 F.3d 715, 722 (11th Cir.1996). In *Morstein*, the court equated being an ERISA entity with having the power to exercise "control over the payment of benefits or [to determine a beneficiary's] rights under the plan." *Id.* at 723; *see also Butero*, 174 F.3d at 1213 (noting that an insurer is an ERISA entity because it could control the payment of benefits under the ERISA plan and could determine the plaintiff's rights under the plan). In *Bridges v. Principal Life Ins. Co.*, 141 F.Supp.2d 1337, 1339 (M.D.Ala. 2001) (Albritton, C.J.), this court explained that

> where a plaintiff brings state law claims relating to an ERISA plan against an insurance company which issued the policy, paid the benefits, and made the decisions regarding eligibility for benefits, and against its agent, rather than an independent broker ... the defendants are ERISA entities.

(citing *Culpepper v. Protective Life Ins. Co.*, 938 F.Supp. 794, 800–01 (M.D.Ala. 1996)) (Albritton, J.) (holding that an insurance company, which issued the policy at issue in the lawsuit, and its agents are ERISA entities).

Loyal American issued the universal life insurance policy at issue in this case, and it made the decisions, using the underwriting criteria discussed previously, regarding which Madix employees were eligible to purchase the policy. If Wilson died prior to the maturity date of her policy, Loyal American would be responsible, under the terms of the policy, for paying the appropriate death benefit to Wilson's beneficiaries. Loyal American had the final decision on determining which claims to pay and the amount of benefits to pay. Ealy Deposition, p. 29, line 5 to p. 30, line 1. Based on the foregoing, the court concludes that Loyal American is an ERISA entity, for Loyal American meets the requirements for being an ERISA entity discussed by this court in *Bridges*. *See* 141 F.Supp.2d at 1339; *see also Dickerson v. Alexander*, 130 F.Supp.2d 1271, 1278 (N.D.Ala.2001) (noting that there "is little doubt that [a life insurance company], as a fiduciary responsible for paying or reviewing death benefits under the plan, is an ERISA entity") (citing *Engelhardt*, 139 F.3d at 1352).

Bostick and Coman were both agents of Loyal American. Bostick entered into a contract to become a general agent for Loyal American on September 20, 2000, a couple of months before the alleged misrepresentations that are the subject of this lawsuit occurred. *See* Bostick's General Agent Agreement with Loyal American, attached as Exh. 3 to the Bostick Submission. Coman testified in his deposition that he entered into a contract with Loyal American to represent them as an agent specifically at the enrollment meetings held at Madix's Goodwater facility. Coman Deposition, p. 6, lines 5–6. As agents of Loyal American, an ERISA entity, both Bostick and Coman are ERISA entities themselves. *See Bridges*, 141 F.Supp.2d at 1339 (concluding that agents of an insurance company are considered ERISA entities when the insurance company is an ERISA entity); *Culpepper*, 938 F.Supp. at

801 (finding that agents of insurance company "clearly qualify as 'ERISA entities' ").[15]

Wilson attempts to rely on *Morstein* for the proposition that neither Bostick nor Coman is an ERISA entity. In *Morstein*, the plaintiff sued the insurance companies that issued and administered her major medical insurance policy that she obtained through her business and the independent insurance agent and insurance agency that sold her the policy. 93 F.3d at 716–17. The Eleventh Circuit noted that under Georgia law, "independent insurance agents are generally considered to be agents of the insured, not the insurer." *Id.* at 717 n. 2 (citing *European Bakers, Ltd. v. Holman,* 177 Ga.App. 172, 338 S.E.2d 702, 704 (1985)). The plaintiff argued that her claims of negligence, malfeasance, misrepresentation, and breach of contract against the independent insurance agency and agent were not preempted by 29 U.S.C. § 1144. The *Morstein* court adopted the following holding: "[W]hen a state law claim brought against a non-ERISA entity does not affect relations among principal ERISA entities as such, then it is not preempted by ERISA." 93 F.3d at 722. Since the independent agency and agent "had no control over the payment of benefits or a determination of [the plaintiff's] rights under the plan," the court concluded that they are not ERISA entities. *Id.* The plaintiff's claims against the independent insurance agency and agent were not defensively preempted by ERISA. *Id.* at 722–23. To hold otherwise, the court noted, would be to immunize independent insurance agents and agencies from any personal liability for fraudulent misrepresentation regarding ERISA plans. *Id.* at 723.

At first blush, *Morstein* appears applicable to the instant case. Bostick owns his own agency, and Coman's relationship with Loyal American was limited to representing them at the enrollment meetings with Madix's employees. Bostick and Coman were, however, agents of Loyal American. In federal district court decisions from Alabama, *Morstein* has been limited strictly to its unique facts due to the Eleventh Circuit's apparent reliance on Georgia state law which the court interpreted as making an independent agent an agent of the insured, not the insurer, and due to the fact that the independent agent and agency in *Morstein* did not have agency agreements with the company that issued the policy in question. *See Morstein,* 93 F.3d at 716–17 & n. 2 (noting reliance on Georgia state law and that the court does not state that the independent agent had an agency relationship with the issuer of the insurance policy at issue). For example, the *Dickerson* court concluded that when an insurance agent and his agency are "acting as licensed agents of [the insurer]," the plaintiff's claims fall outside of the *Morstein* holding. 130 F.Supp.2d at 1279. In *Stoudemire v. Provident Life & Accident Ins. Co.,* 24 F.Supp.2d 1252, 1259 (M.D.Ala.1998), this court concluded that where an insurance company is an ERISA entity, the state law claims against both the insurance company and its agent are preempted when the agent acts as the company's agent and not as an independent agent. In that context, this court specifically distinguished *Morstein* because *Morstein* involved an independent agent who was not an agent for an ERISA enti-

---

**15.** Bostick also was appointed as a general agent of Madix's and was given the task of helping Madix and the Committee find a voluntary benefits provider to replace Jerry Ray and Southern Insurance. Madix is an ERISA entity by virtue of being Wilson's employer. *See Morstein,* 93 F.3d at 721 ("ERISA entities are the employer, the plan, the plan fiduciaries, and the beneficiaries under the plan.").

ty. *Id.* In *Culpepper,* this court again found *Morstein* inapplicable when a plaintiff sued both an insurance company that was an ERISA entity and agents of that insurance company. 938 F.Supp. at 801; *see also Bridges,* 141 F.Supp.2d at 1339 (explaining that agents of an insurance company that is an ERISA entity by virtue of its ability to decide questions of eligibility for and of payment of benefits are ERISA entities).

The court declines to expand *Morstein* beyond its facts. Bostick and Coman were both agents of Loyal American, an ERISA entity. This fact alone brings the claims against them out of the scope of *Morstein.* The court concludes that Bostick and Coman are ERISA entities.

### Part III: Safe Harbor Provision

■ Having concluded that Bostick and Coman are ERISA entities, the last obstacle to complete or super preemption of Wilson's state law claims is the safe harbor exception provided for group and group-type insurance programs in 29 C.F.R. § 2510.3–1(j). This regulation provides:

> For purposes of title I of [ERISA] and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization under which
>
> (1) No contributions are made by an employer or employee organization;
>
> (2) Participation [in] the program is completely voluntary for employees or members;
>
> (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publi-

cize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

> (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3–1(j). A review of the facts of the instant case reveals that Madix's voluntary benefits program does not satisfy all of the safe harbor's four requirements.

Requirement number three is not met. Under the facts reviewed earlier in Part II 1 B of the Discussion and Analysis section of this Memorandum Opinion, the employer clearly endorsed the plan and performed many functions in addition to those listed in the third requirement for safe-harbor treatment under the regulation.

With the third element of the safe-harbor provision unsatisfied, the court concludes that Madix's voluntary benefits program involving the Loyal American universal life insurance policy is an ERISA employee welfare benefit plan. Wilson cannot escape complete preemption by relying on the safe harbor.[16]

### V. Conclusion

The court concludes that the doctrine of complete preemption applies to Wilson's state law claims and that the Defendants have a statutory right to defend this action in federal court. This decision rests, however, on the court's obligation to follow the binding precedents established by the Eleventh Circuit. As the court noted

---

**16.** In reaching this conclusion, the court did not review the letter brief filed by Loyal American's counsel. Therefore, the Plaintiff's Motion to Strike Letter Brief or in the Alternative to Permit a Reply is moot.

above, the question of whether Wilson is seeking relief that is available under 29 U.S.C. § 1132(a) is a contentious one that the court concludes may not be completely answered by relying on precedent, particularly *Butero, Franklin, Hall,* and *Engelhardt.* Furthermore, the reasoning of the *Towne* opinion appears to this court to be sound. Therefore, prior to ruling on any other motions now pending before the court, the court will certify this jurisdictional decision to the Eleventh Circuit for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

## VI. *ORDER*

For the reasons stated above, it is hereby ORDERED as follows:

1. Plaintiff's Motion to Remand (Doc. # 10) is DENIED.

2. For the reasons stated, the court is of the opinion that this Order involves a controlling question of law as to which there is substantial ground for difference of opinion, and an immediate appeal from the Order may advance the ultimate termination of this litigation as well as eight companion cases. The court so certifies, pursuant to 28 U.S.C. § 1292(b).

3. If the Plaintiff makes application to the Court of Appeals within ten days, as required by § 1292(b), proceedings in this court will be stayed pending a determination of whether an interlocutory appeal will be allowed and, if allowed, pending determination of the appeal.

4. Plaintiff's Motion to Strike Letter Brief or in the Alternative to Permit a Reply (Doc. # 23) is DENIED as moot.